BRANCH BANKING AND TRUST COMPANY v. MARGARET W. CREASY

No. 60

(Filed 15 August 1980)

1. **Uniform Commercial Code § 28– guaranty – no specified amount to be paid – instrument not payable to bearer or order – no negotiable instrument**

    A "continuing guaranty" signed by defendant was not a negotiable instrument since it provided a ceiling on the amount of defendant's liability but did not specify the amount of liability that was to be paid, and since there was no provision in the agreement that it was payable to order or bearer. G.S. 25-3-104.

2. **Principal and Surety § 1– signing of suretyship contract – wife primarily responsible for husband's debt**

    By affixing her signature to a document which provided that "This obligation and liability on the part of the undersigned shall be a primary and not a secondary obligation and liability, payable immediately upon demand without recourse first having been had by [plaintiff] against the Borrower ... ," defendant manifested her assent to enter into a suretyship contract which imposed primary liability upon her for the payment of her husband's debt to plaintiff.

3. **Principal and Surety § 1– delivery – elements**

    Delivery consists of an intention to pass an item beyond one's control and physical transfer of the item to another.

Trust Co. v. Creasy

4. **Principal and Surety § 1.1– suretyship agreement complete – no notice of conditions given to creditor**

When the undertaking of a surety is complete and regular on its face, and the obligee has no notice of conditions which have been imposed by the surety, the creditor is entitled to enforce the promise of the surety.

5. **Principal and Surety § 1.1– agreement executed – handing over to attorney – no instructions not to deliver**

By signing a "continuing guaranty" and returning it to her attorney, defendant armed him with what appeared to be an absolute suretyship contract, complete in all respects; defendant in no way manifested her intention that the agreement not be delivered to plaintiff; and by so doing, she incurred the risk that the document could be delivered to plaintiff's possession on behalf of her husband contrary to her uncommunicated intentions.

6. **Principal and Surety § 1.1– execution of "continuing guaranty" – nondelivery alleged – instrument not stolen**

In an action to recover on a "continuing guaranty" executed by defendant, who alleged nondelivery, there was no evidence that the document was stolen from defendant or her attorney where the evidence tended to show that defendant gave her attorney the agreement with no instructions or conditions; the attorney, though representing defendant in trying to work out a marital settlement with her husband, was serving as her husband's agent in obtaining her signature on the document in question; defendant's attorney placed the agreement in a manila folder in his office; and defendant's husband, as a partner in the same law firm as defendant's attorney, had access to the folder in which the document was placed.

7. **Principal and Surety § 1.1– valid surety agreement – extension of time to pay debt – surety not discharged**

In an action to recover on an agreement executed by defendant which made her primarily liable for her husband's debt to plaintiff, there was no merit to defendant's contention that a consent judgment or restitution entered into between defendant's husband and seven banks served to discharge her from her contract, since the contract executed by defendant provided that she guaranteed payment of her husband's debt " . . . in accordance with the terms of any such notes, drafts, debts, obligations or liabilities or agreements evidencing any such indebtedness, obligation or liability including all renewals, extensions and modifications thereof," and the effect of this language was to waive the benefit of the discharge which would otherwise be provided by an extension of time; and since defendant's breach of her agreement occurred on or about 13 July 1976 when plaintiff made a demand for payment and defendant denied liability, but the extension of time was not entered into until December 1976.

Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by plaintiff from the decision of the Court of Appeals reported in 44 N.C. App. 289, 260 S.E. 2d 782 (1979), reversing judgment of *Hasty, J.,* entered 19 December 1978 in MECKLENBURG Superior Court granting summary judgment in favor of plaintiff.

Defendant married Thomas C. Creasy, Jr., in 1955. On 17 October 1975, the couple separated and they have continued to live separate and apart since that date. At the time of the separation, Mr. Creasy was a licensed attorney, practicing in Charlotte as a partner in the firm of Miller, Creasy, Johnston and Allison. After the separation, one of Mr. Creasy's partners, F. Thomas Miller, Jr., began representing defendant in the negotiation of a marital settlement.

At the time of the separation, Mr. Creasy was in debt to plaintiff in the amount of $35,000 on a promissory note which was payable on 30 October 1975. Around 20 October 1975, Mr. Creasy requested plaintiff to renew the note for an additional ninety days. Plaintiff agreed, on the condition that defendant would execute a new guaranty agreement which would be witnessed by someone other than Mr. Creasy. The bank provided him with a completed form for this purpose. Mr. Creasy gave the form to Miller, who was then acting as defendant's attorney, with a request that Miller obtain defendant's signature.

On 7 November 1975, Miller went to defendant's home and requested that she sign the agreement. At that time, Miller was under the impression that the bank held an unlimited guaranty which had been executed by defendant.[1] When Miller met with defendant, he told her that the bank had requested that she sign the agreement and that on behalf of her husband he was asking her to sign. Defendant reluctantly signed the document and, at the time, she did not impose any conditions or give Miller any instructions.

---

[1]In his deposition, Miller stated that it was his purpose to substitute the new "guaranty agreement" for the old agreement. While plaintiff's exhibit "B" purports to be an unlimited guaranty dated 8 October 1973, defendant denied signing it, and the signature of the alleged witness is illegible.

The document which defendant signed is set out in pertinent part as follows:

## GUARANTY AGREEMENT

BRANCH BANKING & TRUST COMPANY
Charlotte, North Carolina
October 20, 1975

Dear Sirs:

As an inducement to you to extend credit to and to otherwise deal with Thomas C. Creasy, Jr. and/or Margaret W. Creasy (hereinafter called Borrower), and in consideration thereof, the undersigned hereby absolutely and unconditionally guarantees to you and your successors and assigns the due and punctual payment of any and all notes, drafts, debts, obligations and liabilities, primary or secondary (whether by way of endorsement or otherwise), of Borrower, at any time, now or hereafter, incurred with or held by you, together with interest, as and when the same become due and payable, whether by acceleration or otherwise, in accordance with the terms of any such notes, drafts, debts, obligations or liabilities or agreements evidencing any such indebtedness, obligation or liability including all renewals, extensions and modifications thereof.

The undersigned is your debtor for all indebtedness, obligations and liabilities for which this Guaranty is made, and you shall also at all times have a lien on all stocks, bonds and other securities of the undersigned at any time in your possession and the same shall at your option be held, administered and disposed of as collateral to any such indebtedness, obligation or liability of the Borrower, and you shall also at all times have the right of setoff against any deposit account of the undersigned with you in the same manner and to the same extent that the right of setoff may exist against the Borrower.

It is understood that any such notes, drafts, debts, obligations and liabilities may be accepted or created by or with you at any time and from time to time without notice to the undersigned, and the undersigned hereby expressly waives presentment, demand, protest, and notice of dishonor of any such notes, drafts, debts, obligations and liabilities or other evidences of any such indebtedness, obligation or liability.

You may receive and accept from time to time any securities or other property as a collateral to any such notes, drafts, debts, obligations and liabilities, and may surrender, compromise, exchange and release absolutely the same or any part thereof at any time without notice to the undersigned and without in any manner affecting the obligation and liability of the undersigned hereby created.

This obligation and liability on the part of the undersigned shall be a primary and not a secondary obligation and liability, payable immediately upon demand without recourse first having been had by you against the Borrower or any person, firm or corporation; .... .

The aggregate amount of principal of all indebtedness, obligations and liabilities at any one time outstanding for which the undersigned shall be liable as herein set forth shall not exceed the sum of $35,000.00.

This agreement shall inure to the benefit of you, your successors and assigns, and the owners and holders of any of the indebtedness, obligations and liabilities hereby guaranteed, and shall remain in force until a written notice revoking it has been received by you; but such revocation shall not release the undersigned from liability to you, your successors and assigns, or the owners and holders of any of the indebtedness, obligations and liabilities hereby guaranteed, for any indebtedness, obligation or liability of the Borrower which is hereby guaranteed and then in existence or from any renewals or extensions thereof in whole or in part, whether such renewals or extensions are made before or after such revocation.

---

Trust Co. v. Creasy

\* \* \*

(The document purports to be signed by Margaret W. Creasy and Thomas C. Creasy, Jr., and witnessed by F.T. Miller, Jr.)

At no time did defendant give Miller any instructions relating to whether the document was to be delivered to plaintiff. After defendant had signed the document, Miller took it into his possession. He returned to his office and placed it in a manila folder along with other papers which related to negotiations concerning a marital settlement between Mr. Creasy and defendant. The last time Miller saw the agreement, it was still in a file labeled "Creasy Matters" which he kept in his private office.

While Miller testified that he had never authorized or directed any person to deliver the agreement to plaintiff, on or about 18 November 1975, the executed document came into the hands of Tyler, the bank's cashier. The agreement was placed in Mr. Creasy's permanent folder. At that time, the loan was renewed and on 9 January 1974, it was paid in full. On 10 February 1974, plaintiff made another loan to Mr. Creasy in the sum of $35,000 upon the execution of a new promissory note due and payable on 10 May 1976.

On 18 May 1976, Mr. Creasy obtained a renewal of the loan for an additional sixty days by executing a new promissory note. He failed to pay any portion of the loan at its due date or thereafter, notwithstanding written demands for payment. On 13 July 1976, plaintiff made demand upon defendant for payment of the loan in full. Defendant refused to pay and plaintiff brought suit.

Plaintiff's motion for summary judgment was granted, and defendant appealed. The Court of Appeals, in an opinion written by Judge Martin (Harry C.), concurred in by Judge Erwin, reversed, holding that summary judgment had been erroneously granted. Judge Webb dissented, and plaintiff appealed pursuant to G.S. § 7A-30(2).

*Murchison and Guthrie, by Alton G. Murchison III, for plaintiff-appellant.*

*Stack and Stephens, by Warren C. Stack and Richard D. Stephens, for defendant-appellee.*

*Edmund D. Aycock for the North Carolina Bankers Association, amicus curiae.*

BRITT, Justice.

The sole issue which is presented for review is whether the Court of Appeals erred in holding that summary judgment had been improperly granted in favor of plaintiff. Our consideration of the matter impels the conclusion that the Court of Appeals was in error, and, accordingly, we reverse.

Our resolution of the present case does not require that we review in detail the law of summary judgment. It is now familiar learning that summary judgment is properly entered if it is established that there is no genuine issue of material fact and that any part is entitled to judgment as a matter of law. *E.g., Kessing v. National Mortgage Corp.,* 278 N.C. 523, 180 S.E. 2d 823 (1971). In deciding the case at bar, we must be sensitive to the standard enunciated in *Kessing* and applied in subsequent cases. *See Odom v. Little Rock & I-85 Corp.,* 299 N.C. 86, 261, S.E. 2d 99 (1980). The party moving for summary judgment has the burden of clearly establishing by the record properly before the court the lack of any triable issue of fact. *Page v. Sloan,* 281 N.C. 697, 190 S.E. 2d 189 (1972). With this framework in mind, we turn now to a consideration of the character of the document which is at the heart of this litigation.

[1] The Court of Appeals held that the materials which were before the trial court were insufficient to establish as a matter of law that plaintiff was a holder in due course of the agreement and was entitled to take it free of the defense of nondelivery. 44 N.C. App. at 294, 260 S.E. 2d at 785. In order to reach this conclusion, it is essential that there first be a determination that the paper writing upon which the bank relies is a negotiable instrument.

The Court of Appeals was in error in treating this document as a negotiable instrument.

To be a negotiable instrument, a writing must be signed by the maker or drawer, must contain an unconditional promise to pay a sum certain in money and no other promise except as authorized by statute, must be payable on demand or at a definite time, and must be payable to order or bearer. G.S. § 25-3-104 (1965); *see Booker v. Everhart*, 294 N.C. 146, 240 S.E. 2d 360 (1978); *see generally* R. Anderson, *Uniform Commercial Code* §§ 3-104:1 to 3-104:25 (2d ed. 1971); F. Hart & W. Willier, *Commercial Paper Under the Uniform Commercial Code* §§ 2.01 to 2.15 (1976). The "continuing guaranty" which was signed by defendant does not meet these requirements.

First, the document which was signed by defendant does not have the attribute of certainty; it provides that: "The aggregate amount of principal of all indebtedness, obligations and liabilities at any one time outstanding for which the undersigned shall be liable shall not exceed the sum of $35,000."

For the requirement of a sum certain to be met, it is necessary that at the time of payment the holder is able to determine the amount which is then payable from the instrument itself, with any necessary computation, without any reference to an outside source. Official Comment, G.S. § 25-3-106 (1965); *Wattles v. Agelastos*, 27 Mich. App. 624, 183 N.W. 2d 906 (1970). It is necessary for a negotiable instrument to bear a definite sum so that subsequent holders may take and transfer the instrument without having to plumb the intricacies of the instrument's background. *Cobb Bank & Trust Co. v. American Mfr's. Mut. Ins. Co.*, 459 F. Supp. 328 (N.D. Ga. 1978).

The document in question calls for a ceiling on the amount of defendant's liability. It does not specify the amount of the liability that is to be paid. That data may be obtained only after resorting to sources of information which are external to the agreement itself. Such an absence is enough by itself to foreclose any finding that the paper at issue is negotiable.

The document upon which plaintiff relies is inadequate as a negotiable instrument in one other respect: At no place in the agreement is there any provision that it is "payable to order or

bearer." For an instrument to be fully negotiable[2] within the scope of Article Three, it must be "payable to order or bearer." *E.g., Mecham v. United Bank of Arizona,* 107 Ariz. 437, 489 P. 2d 247 (1971); *Hall v. Westmoreland,* 123 Ga. App. 809, 182 S.E. 2d 539 (1971); F. Hart & W. Willier, *supra,* § 2.14. Lacking the essential words of negotiability, the paper states that " . . . the undersigned hereby absolutely and unconditionally guarantees to you and your successors and assigns the due and punctual payment of any and all notes, drafts, debts, obligations, and liabilities . . . ."

Having determined that the agreement is not a negotiable instrument, we must now turn to a consideration of its true character.

Although contracts of guaranty and suretyship are, to some extent, analogous, and the labels are used interchangeably, there are, nevertheless, important distinctions between the two undertakings. *See generally* L. Simpson, *Handbook on the Law of Suretyship* 6-8 (1950). A guaranty is a promise to answer for the payment of a debt or the performance of some duty in the event of the failure of another person who is himself primarily liable for such payment or performance. *E.g., O'Grady v. First Union Nat'l Bank,* 296 N.C. 212, 250 S.E. 2d 587 (1978); *Investment Properties of Asheville, Inc. v. Norburn,* 281 N.C. 191, 188 S.E. 2d 342 (1972); *see also* L. Simpson, *supra,* 10-11. A surety is a person who is primarily liable for the payment of the debt or the performance of the obligation of another. *New Amsterdam Cas. Co. v. Waller,* 233 N.C. 536, 64 S.E. 2d 826 (1951); *Dry v. Reynolds,* 205 N.C. 571, 172 S.E. 351 (1934); *see also* L. Simpson, *supra,* 8-9. While both kinds of promises are forms of security, they differ in the nature of the promisor's liability. A guarantor's duty of performance is triggered at the time of the default of another. *Wachovia Bank and Trust Co. v. Clifton,* 203 N.C. 483, 166 S.E. 334 (1932); *see also Arcady Farms Milling Co. v. Wallace,* 242 N.C. 686, 89 S.E. 2d 413 (1955). On the other hand, a surety is

---

[2]Where an instrument meets all of the requirements of G.S. § 25-3-104 except that it is not payable to order or bearer, Article Three applies and governs the instrument except that no one can become a holder in due course. G.S. § 25-3-805 (1965).

primarily liable for the discharge of the underlying obligation, and is engaged in a direct and original undertaking which is independent of any default. *New Amsterdam Cas. Co. v. Waller, supra; Dry v. Reynolds, supra.*

[2] While the document at issue is entitled "guaranty agreement", its label is not determinative of its character. It is appropriate to regard the substance, not the form, of a transaction as controlling, and we are not bound by the labels which have been appended to the episode by the parties. *E.g., Thompson v. Soles,* 299 N.C. 484, 263 S.E. 2d 599 (1980). The agreement expressly states that

> This obligation and liability on the part of the undersigned shall be a primary and not a secondary obligation and liability, payable immediately upon demand without recourse first having been had by [Branch Banking and Trust] against the Borrower or any person, firm, or corporation; . . . ."

By affixing her signature to the document, defendant manifested her assent to enter into a suretyship contract which imposed primary liability upon her for the payment of her husband's debt to the bank. However, identifying the character of the document does not, by itself, resolve the issue raised by defendant's argument that a genuine issue of material fact exists with respect to the effectiveness of the transfer of the document to plaintiff.

[3] Delivery consists of two elements: First, an intention to pass an item beyond one's control; and, second, physical transfer of the item to another. *E.g., Tarlton v. Griggs,* 131 N.C. 216, 42 S.E. 591 (1902). There is absolutely no evidence in the record which would tend to show that plaintiff had any notice whatsoever that when defendant returned the signed agreement to the custody of her attorney, she did not have the present intention of passing the document beyond her control. While it is true that there is nothing in the record which would tend to show how the agreement came to be in the hands of plaintiff's cashier, Tyler, it is also true that there is nothing in the record which would indicate that plaintiff had notice of any circum-

stances which would prompt inquiry on its part. Plaintiff supplied a form contract to its customer, Mr. Creasy, and gave him instructions as to its execution. That same form was returned to it, having been signed and witnessed. It was only upon making demand for payment that plaintiff learned that defendant did not intend that the document be delivered.

[4] When the undertaking of a surety is complete and regular on its face, and the obligee has no notice of conditions which have been imposed by the surety, the creditor is entitled to enforce the promise of the surety. *Cowan v. Roberts*, 134 N.C. 415, 46 S.E. 979 (1904); *Vass v. Riddick*, 89 N.C. 6 (1883); *Gwyn v. Patterson*, 72 N.C. 189 (1875); *see generally* 10 S. Williston, *A Treatise on the Law of Contracts* § 1244 (3rd ed. 1967).

[5] By signing the agreement and returning it to her attorney, defendant armed him with what appeared to be an absolute suretyship contract, complete in all respects. The deposition of defendant's attorney, Miller, discloses that defendant did not, at the time she signed the agreement, give him any instructions concerning the document. Nor did she subsequently give him any instructions regarding its disposition. In no way did defendant manifest her intention that the agreement not be delivered to plaintiff. By so doing, she incurred the risk that the document could be delivered to plaintiff's possession on behalf of her husband contrary to her uncommunicated intentions. In such a situation, it is well established that where one of two persons must suffer loss by the misconduct of a third person, the loss should fall upon him who first reposed the confidence, or who, by his negligence, made it possible for the loss to occur, rather than an innocent third person. *Cowan v. Roberts, supra; Vass v. Riddick, supra; see also* 10 S. Williston, *supra*, § 1245.

Thus, the proper inquiry is not whether the surety intended that the agreement be delivered to the obligee. Rather, the question becomes whether, assuming *arguendo* that there was no intention to deliver the agreement, the surety manifested that lack of intention in such a way that the obligee would be put on notice of the surety's state of mind. While there is evidence in the record which tends to show that defendant did not intend for the agreement to be returned to plaintiff, there is

absolutely no evidence that her intentions in this matter were communicated to anybody, let alone plaintiff.

[6] There is no evidence that the document was stolen from defendant or Miller. In her deposition, defendant testified that she signed the document after discussing it with Miller. "I did not give him any instructions or any conditions. I merely signed it and handed it to him as my attorney."

In his deposition, Miller testified that after the document was executed on 7 November 1975 by defendant, and he affixed his signature as a witness, he took the document into his possession. He then testified:

> ... The document was retained in my possession and I brought it to my office and inserted it in a manilla folder type file that I was maintaining with respect to the affairs of Mr. and Mrs. Creasy ... .

> The manilla file which I kept in my office did not have a label attached to it and it was either a blank manilla folder or had in pencil "Creasy Matters" or some other identification. Generally that file was kept in my office adjacent to my desk or at the desk of Mrs. Harriet Smith, who was Mr. Creasy's secretary, and with whom I discussed matters in connection with the affairs of Mr. and Mrs. Creasy jointly.

* * *

> ... I was not told by Mrs. Creasy not to deliver the document to the bank, nor was I told by her not to deliver the document to Mr. Creasy. Mrs. Creasy signed the document at my request and delivered it to me. I brought it to my office and placed it in a manilla folder. I never delivered that document to Branch Banking and Trust. If I delivered Plaintiff's Exhibit A to Harriet Smith it was through transmitting the manilla folder back and forth between her desk and mine with the instrument in the file. I do not recall ever having delivered Plaintiff's Exhibit A to Mr. Creasy, but if I did so, it would have been under the same circumstances that I delivered it to Mrs. Smith in a manilla folder. Every-

one employed in the office had access to my files in my personal office, and that included the partners of the firm together with the associate lawyers, and they would have had access to Mrs. Harriet Smith's files. Mr. Creasy would have had access to the manilla folder.

Although Miller was representing defendant in trying to work out a marital settlement with her husband, with respect to obtaining her signature to the document in question, he was serving as Mr. Creasy's agent. In his deposition, Miller testified:

Mr. Creasy informed me that he was negotiating a loan transaction with Branch Banking and Trust Company, that they had asked that a guaranty agreement be signed by Mrs. Creasy, and in view of the state of affairs and the state of separation, he requested that I submit it for her signature rather submit it himself.

\* \* \*

... I visited with Mrs. Creasy and explained the circumstances of a loan being negotiated by Mr. Creasy with Branch Banking and suggested to her that the bank had requested this guaranty agreement and that I was asking her to sign it on behalf of her husband.

An agent is one who acts for or in the place of another by authority from him. *Julian v. Lawton*, 240 N.C. 436, 82 S.E. 2d 210 (1954). It was in this capacity that Miller procured Mrs. Creasy's signature on the document. Since Miller was acting as Mr. Creasy's agent, and Mr. Creasy had access to the manilla folder in which the document was placed, there could not have been a larceny of the document. When the agreement was returned to plaintiff complete and regular on its face, the bank was under no duty to make inquiry of either Miller or defendant as to the circumstances surrounding its execution.

[7] Defendant makes the further argument that a consent judgment of restitution entered into between Mr. Creasy and seven banks serves to discharge her from her contract. This contention is untenable.

On 1 November 1976, the Grand Jury for the United States District Court for the Western District of North Carolina indicted Mr. Creasy on seven counts of knowingly making false statements for the purpose of influencing banks insured by the Federal Deposit Insurance Corporation. On 21 December 1976, Chief Judge Woodrow W. Jones of the United States District Court for the Western District of North Carolina, entered a consent judgment against Mr. Creasy. The judgment provides that Mr. Creasy's debt to seven different banks, one of which is plaintiff, is nondischargeable under the Bankruptcy Act, that Mr. Creasy will attempt to repay the indebtedness over a period of fifteen years, and that the banks are to share in any income which Mr. Creasy receives over and above the sum of $18,000 per year.

As a general rule, material alteration of the contract between the principal and the creditor will operate to discharge a surety. *Fleming v. Barden,* 127 N.C. 214, 37 S.E. 219 (1900); *See also* L. Simpson, *supra,* 329-351. If the creditor enters into a binding agreement with the principal debtor to extend the time of payment or performance, there has been a material alteration of the contract, and the surety is discharged. *First Nat'l. Bank of Salisbury v. Swink,* 129 N.C. 255, 39 S.E. 962 (1901); *see also* L. Simpson, *supra,* 351-370; 10 S. Williston, *supra,* § 1222. Such an agreement is binding if it is definite as to time, *Revell v. Thrash,* 132 N.C. 803, 44 S.E. 596 (1903), and is supported by consideration. *See* L. Simpson, *supra,* 356-361.

While it is clear that the extension of time provided by the consent judgment is definite as to time and is supported by consideration[3], the validity of the agreement it embodies does not serve to discharge defendant for two reasons. First, the contract of suretyship which defendant executed with plaintiff provided that she guaranteed the payment of her husband's debt " ... in accordance with the terms of any such notes, drafts, debts, obligations or liabilities or agreements evidencing any such indebtedness, obligation or liability including all renewals, extensions and modifications thereof." The effect of this language is to waive the benefit of the dis-

---

[3]The agreement between Mr. Creasy and the banks provides that the parties agreed to mutually compromise and settle the debts owed to each bank by him.

charge which would otherwise be provided by an extension of time. Second, defendant's breach of her agreement occurred on or about 13 July 1976 when plaintiff made a demand for payment and defendant denied liability. The extension of time was not entered into until several months later in December 1976.

For the reasons stated, the decision of the Court of Appeals. is

Reversed.

Justice BROCK did not participate in the consideration or decision of this case.

