PER CURIAM.
Edward J. Thomas and his wife, Ruth Thomas, appeal from a summary judgment in favor of Wells Fargo Bank, N.A., as Trustee for the Certifieateholders of Soundview Home Loan Trust 2007-OPT1, Asset-Backed Certificates, Series 2007-OPT1 (“the trustee”), in the trustee’s ejectment action against them. We affirm.

Factual and Procedural Background

The Thomases refinanced the existing mortgage on their residence located in Mathews through a new mortgage loan from Option One Mortgage Corporation (“Option One”). On February 23, 2007, Edward Thomas executed an adjustable-rate note in favor of Option One, agreeing to pay a principal indebtedness of $480,000 over a period of 30 years with initial monthly payments of $5,141.47. The Thomases executed a mortgage securing the note in favor of Option One. The mortgage was recorded on March 2, 2007, in the office of the Judge of Probate of Montgomery County.
It is undisputed that, after making four or five payments on the note, the Thom-ases made no further payments. On November 8, 2007, Option One notified the Thomases that it was accelerating the maturity date of the loan and that foreclosure proceedings were imminent.[1] On November 14, 2007, an attorney representing the trustee notified the Thomases via certified letter that the trustee (who, according to the letter, was the creditor to whom the debt was owed) was commencing foreclosure proceedings, with a foreclosure sale scheduled for December 13, 2007. The letter enclosed a copy of the foreclosure notice to be published in the newspaper. That notice stated in pertinent part:
“Default having been made in the indebtedness secured by that certain mortgage executed by Edward J. Thomas and Ruth Thomas, husband and wife to Option One Mortgage Corporation, dated February 28, 2007, said mortgage being recorded in Book 03497, Page 0607, in the Office of the Probate Judge of Montgomery County, Alabama. Said mortgage was last sold, assigned, and *228 transferred to Wells Fargo Bank, N.A., as Trastee for the Certificateholders of Soundview Home Loan Trust 2007-OPT1, Asset-Backed Certificates, Series 2007-OPT1.
“The undersigned, as Trastee for the Certificateholders of Soundview Home Loan Trust 2007-OPT1, Asset-Backed Certificates, Series 2007-OPT1, under and by virtue of the power of sale contained in said mortgage, will sell at public outcry to the highest bidder for cash before the courthouse door of ... Montgomery County, Alabama during the legal hours of sale, on December 13, 2007, the following described real estate situated in Montgomery County, Alabama.”
The following day, on November 15, 2007, Option One assigned the mortgage and the indebtedness secured thereby to the trustee. The assignment was recorded on January 9, 2008, in the office of the Judge of Probate of Montgomery County. The foreclosure sale was subsequently postponed to March 6, 2008, and newspaper notices were republished. On March 6, 2008, the trustee conducted a foreclosure sale and purchased the property for $510,000. When the Thomases refused to relinquish possession of the property in response to the trustee’s demand, the trustee filed an action in the Montgomery Circuit Court, seeking to eject the Thomases from the property.
The Thomases answered, asserting that the trustee had lacked standing to foreclose because, they alleged, the trustee did not own the note and mortgage at the time it instituted the foreclosure proceedings. The Thomases also asserted counterclaims against the trustee,[2] and third-party claims against Option One and Option One Mortgage Services, Inc. (hereinafter referred to as “the Option One defendants”).[3] Following discovery, the Thomases amended their complaint to assert similar claims against an additional third-party defendant, Lender Processing Services, Inc. (“LPS”), a manufacturer of loan-tracking software used by mortgage companies.
The Thomases moved for a summary judgment based on the trustee’s alleged lack of standing. After the parties had engaged in extensive discovery, the trustee, the Option One defendants, and LPS also moved for a summary judgment. On March 28, 2011, the trial court denied the Thomases’ motion for a summary judgment and entered a summary judgment in favor of the trustee, the Option One defendants, and LPS. The Thomases filed a timely postjudgment motion on April 27, 2011, specifically requesting a hearing on that motion. The trial court set the matter for a hearing, but the hearing was held on August 8, 2011, after the motion had been denied by operation of law on July 26, 2011, pursuant to Rule 59.1, Ala. R. Civ. P. The Thomases appealed on August 31, 2011; the supreme court transferred the appeal to this court pursuant to § 12-2-7(6), Ala. Code 1975.

Standard of Review

Appellate review of a summary judgment is de novo. Ex parte Ballew, 771 So.2d 1040 (Ala.2000). A motion for a *229 summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(8), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing “that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law.” Rule 56(c)(3); see Lee v. City of Gadsden, 592 So.2d 1036, 1038 (Ala.1992). If the movant meets this burden, “the burden then shifts to the nonmovant to rebut the movant’s prima facie showing by ‘substantial evidence.’ ” Lee, 592 So.2d at 1038 (footnote omitted). “[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.” West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989); see § 12-21-12(d), Ala.Code 1975.

Discussion

On appeal, the Thomases challenge only the propriety of the summary judgment in favor of the trustee on its ejectment claim. They do not argue that the summary judgment in favor of the trustee as to their counterclaims was erroneous or that the summary judgments in favor of the third-party defendants were erroneous. The Thomases focus their argument solely on the trustee’s alleged lack of standing to foreclose. They concede that they were in default of their loan agreement at the time foreclosure proceedings were initiated, but, they contend, the trustee did not establish that it was the entity to which their debt was owed.
I. The Mortgage
Citing Sturdivant v. BAC Home Loans Servicing, LP, [Ms. 2100245, December 16, 2011] — So.3d -, - (Ala.Civ.App.2011), the Thomases argue that the trustee had no authority to foreclose because it did not receive an assignment of the mortgage from Option One until November 15, 2007, and foreclosure proceedings commenced on November Dh 2007, when an attorney who represented the trustee notified the Thomases that the trustee was accelerating the maturity date of the loan and initiating foreclosure proceedings. Sturdi-vant, which dealt with the timeliness of a mortgage assignment, is not controlling here because the trustee made a prima facie showing that, six months before the initiation of foreclosure proceedings, the trustee was the holder of the Thomases’ promissory note. See § 35-10-12, Ala. Code 1975 (providing that the power of sale in a mortgage may be exercised “by any person, or the personal representative of any person who, by assignment or otherwise, becomes entitled to the money thus secured”); Harton v. Little, 176 Ala. 267, 270, 57 So. 851, 851 (1911); and Perry v. Federal Nat’l Mortg. Ass’n, 100 So.3d 1090, 1095 (Ala.Civ.App.2012). See generally Restatement (Third) of Property: Mortgages § 5.4(a) (1997) (stating that “[a] transfer of an obligation secured by a mortgage also transfers the mortgage unless the parties to the transfer agree otherwise”).
II. The Note
Paragraph 19 of the Thomases’ mortgage provided that “[t]he note or a partial interest in the note (together with this security instrument) may be sold one or more times without notice to borrower.” The Thomases’ loan was transferred several times. First, the loan was transferred to Bank of America and Option One Owner Trust 2001-2002, and then to UBS War-burg Real Estate Securities, Inc., and Option One Owner Trust 2002-2003. On April 30, 2007, the loan was part of a pool of loans that was sold to Greenwich Capital Financial Products, Inc. (“Greenwich”). On May 15, 2007, Greenwich transferred *230 the loan to its affiliate, Financial Asset Securities Corporation (“FASCO”). On the same day, the Thomases’ loan, along with other mortgage loans, was pooled into a trust and converted to mortgage-backed securities, a process known as “securitization.” The Thomases’ loan was conveyed to the trustee, pursuant to a “Pooling and Servicing Agreement” (“PSA”) that had been executed on April 1, 2007, by the depositor (FASCO), the servicer (Option One), and the trustee (Wells Fargo). The PSA states that it is governed by New York law and that its purpose is to establish a real-estate-mortgage-investment-conduit (“REMIC”) trust. The PSA sets out specific requirements regarding the timing and manner of transferring assets to the trust so as to ensure that the trust is exempt from federal income tax,[4] and the parties to the trust agreed not to take any action that would cause the trust to be subject to federal income tax. In order to be in compliance with Internal Revenue Code requirements, the PSA set a “closing date” of May 15, 2007, for the transfer of assets to the trust and provided a 90-day window (which window closed on August 13, 2007) for finalizing any documentation necessary to complete the transfer of assets to the trust. Section 2.01 of the PSA states:
“The Depositor [FASCO], concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, in-eluding any security interest therein for the benefit of the Depositor, in and to ... each Mortgage Loan identified on the Mortgage Loan Schedule ....
“In connection with such transfer and assignment, the Depositor does hereby deliver to and deposit with the Custodian on behalf of the Trustee, the [the mortgage and the mortgage note, along with the chain of assignments pertinent to each mortgage loan].”
The Thomases’ loan was specifically identified and listed on the PSA mortgage-loan schedule as of the closing date on May 15, 2007.
Patrick Gorrien, a Wells Fargo employee who was responsible for receiving and tracking the collateral files related to loans for which Wells Fargo was the document custodian, testified by deposition. Gorrien explained that Wells Fargo, in addition to being the securitization trustee, was also the document custodian for the securitization trust. According to Gorrien, Wells Fargo had also been the document custodian for Option One and the other entities that had had an interest in the Thomases’ loan before it was securitized. Gorrien testified that Wells Fargo had received from Option One actual physical possession of the collateral file pertaining to the Thomases’ loan on March 9, 2007. That file contained, among other things, the Thomases’ promissory note. The note is indorsed in blank by an authorized representative of Option One; the indorsement is not contained on the note itself, but on an allonge.[5]
*231 Gorrien explained that each time the Thomas loan had been transferred to a different entity, the collateral file had been relabeled and placed on a different shelf corresponding to the location of that other entity’s files. Gorrien testified that Wells Fargo, in its capacity as the securitization trustee, had physical possession of the collateral file containing the Thomases’ note on May 15, 2007, the closing date of the trust. Gorrien stated that, in accordance with the terms of the PSA, he had certified on three different occasions — May 15, 2007, June 26, 2007, and April 1, 2008— that Wells Fargo held the collateral files as custodian for the trust.
The Thomases maintain that the trustee’s physical possession of the note on May 15, 2007, was not determinative for two reasons. First, they say, the acquisition of trust assets was governed by the PSA, which was, in turn, governed by New York Law. Second, they contend, the note was not a “negotiable instrument” that could be transferred by possession because it required “an additional undertaking or instruction” beyond the payment of money. We will address those two arguments in turn.
A. Applicability of the PSA
The Thomases argue that the conveyance of the loan documents to the trust was void under New York law because the trust did not acquire those documents in compliance with the express terms of the PSA. In support of that argument, the Thomases point to the affidavit and deposition testimony of Thomas Adams, their expert witness.
Adams, a New York lawyer who had represented issuers of mortgage-backed securities and had later been employed as a credit analyst at Moody’s Investors Service, opined that the trustee did not own the Thomases’ note because, he said, the requirements of the PSA had not been satisfied. First, Adams said, the PSA required the depositor (FASCO) to deliver the collateral files to the trust’s document custodian (Wells Fargo) on May 15, 2007, but, according to Adams, there was no actual “delivery” by FASCO to Wells Fargo on that date because Wells Fargo, in its capacity as the document custodian for entities other than the securitization trust, already possessed the collateral file containing the Thomases’ note. Accordingly, Adams said, delivery of the Thomases’ note to the trust’s document custodian was actually made by the originator of the loan (Option One) rather than the depositor, in violation of the PSA’s requirement that the trust receive title to trust assets only from the depositor. Second, Adams stated that the PSA requirements were not satisfied because the transfer of the Thomases’ mortgage to the trust was made after the closing date of May 15, 2007, and after the 90-day extension of August 13, 2007, had passed. Last, Adams said, the mortgage did not reflect a complete chain of assignments and the note did not reflect a complete chain of indorsements, as required by the PSA.
In response to the Thomases’ challenge to the trustee’s authority to enforce the note and mortgage based on alleged viola *232 tions of the PSA, the trustee argues that the Thomases, who were neither parties to the PSA nor third-party beneficiaries of the PSA, do not have “standing” to invoke the PSA. A substantial number of courts in other jurisdictions have agreed with similar lack-of-standing arguments made by mortgagees. See, e.g., Correia v. Deutsche Bank Nat’l Trust Co. (In re Correia), 452 B.R. 319, 324-25 (1st Cir. BAP 2011); Bittinger v. Wells Fargo Bank, NA, 744 F.Supp.2d 619, 625-26 (S.D.Tex.2010); In re Smoak, 461 B.R. 510, 518-21 (Bankr.S.D.Ohio.2011); and In re Almeida, 417 B.R. 140, 149 n. 4 (Bankr.D.Mass.2009).
“Most of the reported decisions arise in cases in which the borrower initiated a lawsuit against the mortgagee seeking a determination that it lacked authority to enforce the subject note and mortgage or wrongfully foreclosed on the mortgage. Other decisions emanate from bankruptcy proceedings in which the debtor either initiated affirmative adversary proceedings against the mortgagee raising similar claims, objected to the mortgagee’s proof of claim, or challenged the mortgagee’s right to seek relief from the automatic stay.”
In re Walker, 466 B.R. 271, 285 (Bankr.E.D.Pa.2012) (emphasis added; footnotes omitted). We question whether the defendant-mortgagor in an ejectment action must satisfy a “standing” requirement in order to assert a defense against claims brought by the plaintiff-mortgagee. See Deutsche Bank Nat’l Trust Co. v. Williams, (Civ. No. 11-00632 JMS/RLP) (D.Hawaii, March 29, 2012) (noting that “ ‘[standing’ is a plaintiffs requirement,” and reasoning that when a lender is the plaintiff seeking to have the court declare the validity of a judicial foreclosure, the lender must prove its standing, but that when lenders are defending themselves in an action brought by borrower, lenders need not “establish ‘standing’ to defend themselves”).
We need not decide, however, whether the Thomases are prohibited (either by principles of standing or privity of contract) from asserting alleged violations of the PSA because, even assuming that such violations occurred, the violations did not affect the trustee’s right to enforce the note. Paragraph 15 of the Thomases’ mortgage specifically provides: “This security instrument shall be governed by federal law and the law of the jurisdiction in which the property is located.” The law of the situs of secured property generally governs foreclosure proceedings. See Restatement (Second) of Conflicts of Law § 229 (1971) (“The method for the foreclosure of a mortgage on land and the interests in the land resulting from the foreclosure are determined by the local law of the situs.”). Thus, as discussed in Part H.B., infra, under Alabama law, the trustee had standing to foreclose on the property.
B. Negotiability of the Note
The Thomases contend that the note was nonnegotiable because it did not represent “an unconditional promise ... to pay a fixed amount of money” without requiring an “additional undertaking.” See Ala.Code 1975, § 7-3-104(a)(3). The Thomases maintain that the following provision in the note requires an undertaking other than the payment of money:
“5. Borrower’s Right to Prepay.
“I have the right to make payments of principal at any time before they are due. A prepayment of all the unpaid principal is known as a ‘full prepayment.’ A prepayment of only part of the unpaid principal is known as a ‘partial prepayment.’ When I make a full prepayment or partial prepayment, I will tell the *233 note holder in writing that I am doing so.”
(Emphasis added.)
Citing Lyons Savings & Loan Ass’n v. Geode Co., 641 F.Supp. 1313 (N.D.Ill.1986), Persky v. Bank of America National Ass’n, 261 N.Y. 212, 185 N.E. 77 (1933), and Branch Banking & Trust Co. v. Creasy, 301 N.C. 44, 269 S.E.2d 117 (1980), the Thomases argue that the obligation imposed upon them to send written notice with any prepayment of principal constitutes “an undertaking or instruction ... to do an act in addition to the payment of money” that destroys the negotiability of the note. None of the decisions cited by the Thomases addresses whether a requirement to notify the lender of a prepayment of principal destroys the negotiability of the note. However, the United States Bankruptcy Court for the Eastern District of Pennsylvania addressed that precise issue in In re Walker, supra:
“ ‘The right of defendants, under the note, to prepay part of the principal does not constitute an “additional undertaking or instruction” that adversely affects the negotiability of the note. Quite the opposite, the right of prepayment is a voluntary option that defendants may elect to exercise solely at their discretion. Indeed, such an allowance confers a benefit, not a burden, upon defendants, who can freely choose to decline the opportunity. The fact that defendants must notify the lender in the event they opt for prepayment imposes no additional liability on them and is not a condition placed on defendants’ promise to pay. Rather, notification is simply a requirement of the exercise of the right of prepayment which, as noted, defendants are free to reject. This requirement does not render the note in issue non-negotiable.’ ”
466 B.R. at 283-84 (quoting HSBC Bank USA, N.A. v. Gouda, 73 U.C.C. Rep. Serv.2d 226 (N.J.Super.Ct.App.Div., December 17, 2010) (not reported in A.3d)).
Under Alabama law, the note is a negotiable instrument and is, therefore, subject to Alabama’s version of the Uniform Commercial Code. See Ala.Code 1975, § 7-3-104. Under § 7-3-301, Ala. Code 1975, a “[pjerson entitled to enforce” an instrument is defined as
“(i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to Section 7-3-309 or 7-3-418(d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.”
(Emphasis added.) With respect to a negotiable instrument, “holder” means a person in possession if the instrument is payable to bearer. Ala.Code 1975, § 7-1-201(21). If a negotiable instrument has been indorsed in blank, as the Thomases’ note had been, the instrument “becomes payable to ‘bearer’ and may be negotiated by transfer of possession alone....” Ala. Code 1975, § 7-3-205(b). Possession of a note payable to order and indorsed in blank is prima facie evidence of ownership. See Berney v. Steiner, 108 Ala. 111, 116, 19 So. 806, 807 (1896). Based on the foregoing authority, the trustee, by virtue of its possession of the Thomases’ note, was entitled to conduct foreclosure proceedings and, by virtue of its foreclosure deed, was authorized to eject the Thomases from the property. Accordingly, the fact that the Thomases’ note and mortgage did not contain complete chains of indorsements or assignments — defects that allegedly violated the PSA — was not a defense to the *234 trustee’s ejectment action. See Peterson-Price v. U.S. Bank Nat’l Ass’n, (Civil No. 09-495 ADM/JSM, May 4, 2010) (D.Minn.2010) (not reported in F.Supp.2d) (holding that, when “ ‘the chain of endorsement’ of the note and mortgage did not conform to the chain of endorsement specified in the PSA,” the nonconformity did not affect lender’s rights under Minnesota law); see also Anderson v. Countrywide Home Loans, (Civil No. 10-2685 MJD/JJG, April 8, 2011) (D.Minn.2011) (not reported in F.Supp.2d).
By the same token, the fact that the Thomases’ collateral file containing the note may have been transferred to the trust by the originator, rather than by the depositor, in violation of the terms of the PSA is of no consequence. See In re Samuels, 415 B.R. 8 (Bankr.D.Mass.2009). In Samuels, the debtor argued that
“the PSA required that all mortgages acquired thereunder to be funneled to [the] pool trustee, through the entity designated by the PSA as ‘depositor,’ .... A failure to follow this protocol-such as by direct assignment of the mortgage from the loan originator to the pool trustee, bypassing the depositor— would, the Debtor contends, constitute a breach of the PSA, a breach of fiduciary obligations under the PSA to investors, a breach of federal regulations, and an act giving rise to unfavorable tax consequences for the investors.”
415 B.R. at 22. Rejecting the debtor’s argument that a direct assignment bypassing the depositor was invalid, the bankruptcy court stated:
“This argument falls far short of its goal. Even if this direct assignment were somehow violative of the PSA, giving rise to unfavorable tax, regulatory, contractual, and tort consequences, neither the PSA nor those consequences would render the assignment itself invalid. In fact, under the Debtor’s own argument, the unfavorable consequences could and would arise only if, and precisely because, the assignment were valid and effective.”
Id. (footnote omitted).
III. Loss Mitigation
On appeal, the Thomases argue that the foreclosure was invalid because, they say, they had reached a loan-modification agreement with Option One that cured their default. The Thomases have waived this argument because, in the trial court, their counsel (who is not appellate counsel) stipulated that no such agreement had been reached and withdrew any claim or defense based on a purported loan-modification agreement. See Ezell v. Childs, 497 So.2d 496, 498 (Ala.Civ.App.1985) (stating that oral agreements in open court are binding upon the parties).
IV. Postjudgment Hearing
The Thomases argue that the trial court erred in failing to hold a hearing on their postjudgment motion before that motion was denied by operation of law pursuant to Rule 59.1, Ala. R. Civ. P. Rule 59(g), Ala. R. Civ. P., provides that postjudgment motions “remain pending until ruled upon by the court (subject to the provisions of Rule 59.1), but shall not be ruled upon until the parties have had opportunity to be heard thereon.” Initially, we note that it is within the power of the parties to prevent the denial of a postjudgment motion by operation of law before a hearing on the motion has been held. Rule 59.1 states that the parties may, by their express consent (which consent must appear of record), extend the time for ruling on the motion or move for relief from an appellate court. No such consent or appellate-court order appears of record in this case.
*235 “Harmless error occurs, within the context of a Rule 59(g) motion, where there is either no probable merit in the grounds asserted in the motion, or where the appellate court resolves the issues presented therein, as a matter of law, adversely to the movant, by application of the same objective standard of review as that applied in the trial court.”
Greene v. Thompson, 554 So.2d 376, 381 (Ala.1989).
In the present case, we conclude that the trial court’s failure to conduct a timely hearing on the Thomases’ post-judgment motion was harmless error. In that motion, the Thomases argued that the trust had not properly acquired the note and mortgage according to the PSA and New York law and that the trustee had wrongfully foreclosed — both of which issues had already been presented to the trial court and briefed in the Thomases’ motion for a summary judgment. The Thomases also submitted in support of their motion three exhibits alleged to constitute newly discovered evidence: (1) an April 13, 2011, consent order involving LPS and the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision; (2) an April 6, 2011, order entered by the United States Bankruptcy Court for the Eastern District of Louisiana, determining that Option One and LPS had committed fraud on the court by filing false affidavits; and (3) a March 25, 2011, order of the Russell Circuit Court in Case No. CV-08-362, Horace v. LaSalle Bank National Ass’n, permanently enjoining a securitization trustee from foreclosing on a debtor’s property, based upon the circuit court’s determination that the trustee had failed to comply with the terms of its PSA and New York law “in attempting to obtain assignment of [the debtor’s] note and mortgage,” and determining that the debtor was a third-party beneficiary of the PSA.
Because the Thomases raise no issue on appeal with regard to the summary judgment in favor of LPS, we need not consider the effect of the April 13, 2011, consent order involving LPS. The bankruptcy court’s April 6, 2011, order determining that Option One and LPS had committed fraud on the court by filing false affidavits has no relation to the Thomases or their property. The bankruptcy court found that Option One and LPS had negligently or wantonly failed to document the debt- or’s payments and had wrongly declared a default when, in fact, no default had occurred. In the present case, the Thom-ases acknowledged that they were in default and the sole question was whether the trustee was authorized to foreclose on their property. The order of the Russell Circuit Court, which differed from the Montgomery Circuit Court’s ruling on a question of law, does not constitute newly discovered evidence.

Conclusion

The trustee established that, before it initiated foreclosure proceedings on November 14, 2007, it was in actual physical possession of the Thomases’ note, a negotiable instrument that was indorsed in blank. The Thomases submitted no evidence to the contrary. The trustee further established, by virtue of its foreclosure deed, that it was entitled to eject the Thomases from the property. Therefore, the trial court’s judgment is due to be affirmed.
AFFIRMED.
BRYAN, THOMAS, and MOORE, JJ., concur.
*236 THOMPSON, P.J., concurs in the result, without writing.
PITTMAN, J., recuses himself.

. Unlike the mortgage at issue in Jackson v. Wells Fargo Bank, N.A., 90 So.3d 168 (Ala.2012), the Thomases’ mortgage did not contain a requirement that the lender give the borrower notice of and an opportunity to cure the default before acceleration.

. The counterclaims were based upon the trustee’s alleged negligence; wantonness; trespass; abuse of process; slander of title; respondeat-superior liability; negligent or wanton hiring, supervision, training, or retention; and joint-venture liability.

. The third-party claims against the Option One defendants included breach of contract; civil conspiracy; negligence; wantonness; violation of the Fair Debt Collection Practices Act; wrongful foreclosure; unjust enrichment; breach of a modification agreement; fraud; suppression; civil conspiracy; respon-deat-superior liability; negligent hiring, training, and supervision; and joint-venture liability-

. 26 U.S.C. § 860A provides:
"(a) General rale. — Except as otherwise provided in this part, a REMIC shall not be subject to taxation under this subtitle (and shall not be treated as a corporation, partnership, or trust for purposes of this subtitle).
"(b) Income taxable to holders. — -The income of any REMIC shall be taxable to the holders of interests in such REMIC as provided in this part.”

. An allonge is a separate paper containing an indorsement. Congress v. U.S. Bank, N.A., 98 So.3d 1165, 1166 (Ala.Civ.App.2012). Originally, tire use of an allonge "was allow *231 able only when the back of the instrument itself was so covered with previous indorse-ments that convenience or necessity required additional space for further indorsements.” See Clark v. Thompson, 194 Ala. 504, 505, 69 So. 925, 925 (1915). The last sentence of § 7-3-204(a), Ala.Code 1975, provides that, "[f¡or dle purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is part of the instrument.” The Official Comment to § 7-3-204 states that ”[a]n indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement.”