Lucas v. Hopper, 2026 NCBC 38.

STATE OF NORTH CAROLINA

ROCKINGHAM COUNTY

ANDREW LUCAS, SHANNON LUCAS, and SDB PARTNERS OF EDEN, LLC,

Plaintiffs,

v.

HAROLD HOPPER, LINDA HOPPER, TYLER HOPPER, and LH SERVICE, INC.,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CVS000502-780

**AMENDED ORDER AND OPINION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS, AND DEFENDANTS' MOTION TO STRIKE THE AFFIDAVIT OF ANDREW LUCAS**

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (ECF No. 67), Defendants' Motion for Judgment on the Pleadings (ECF No. 68), and Defendants' Motion to Strike the Affidavit of Andrew Lucas ("Motion to Strike") (ECF No. 85).

**THE COURT**, having considered the motions, the exhibits submitted in support of and in opposition to the motions, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, **CONCLUDES** that Defendants' Motion for Summary Judgment should be **GRANTED in part** and **DEFERRED in part**, Defendants' Motion for Judgment on the Pleadings should be **DENIED as moot**, and Defendants' Motion to Strike should be **GRANTED in part** and **DENIED in part**.

*Fitzgerald Hanna & Sullivan, PLLC, by Andrew Fitzgerald, Stuart Punger, Jr., and Douglas W. Hanna, for Plaintiffs Andrew Lucas, Shannon Lucas, and SDB Partners of Eden, LLC.*

*Carruthers & Roth, P.A., by Rachel S. Decker and Kevin A. Rust, for Defendants Harold Hopper, Linda Hopper, Tyler Hopper, and LH Service, Inc.*

Davis, Judge.

## INTRODUCTION

1.     This case essentially involves a dispute regarding the business relationship between two individuals—Andrew Lucas and Harold Hopper—between 2016 and 2023.  Lucas contends that their relationship gave rise to an implied partnership under North Carolina law and that he has been denied his full share of the profits from the projects on which the two of them worked.  Hopper, conversely, maintains that no partnership existed and that Lucas was merely an independent contractor.  In this case, the Court must address the issue of when an implied partnership (or joint venture) exists in the absence of a formal agreement between the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

2.     "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at *1–2 (N.C. Super. Ct. Jan. 19, 2021) (cleaned up).[1]

---

[1] The record is not always crystal clear as to certain aspects of the business relationship between Lucas and Hopper or of the events set out below. Nevertheless, the Court has attempted herein to summarize those events with as much clarity as possible.

3.     Plaintiff Andrew Lucas ("Andrew")[2] has worked for decades in the environmental consulting industry and started working for the MillerCoors company at a facility located in Eden, North Carolina (the "Eden Facility") in or around 2008 as a plant environmental engineer. (Dep. of Andrew Lucas ["A. Lucas Dep."] 10:20–12:3, ECF No. 78.2.)

4.     Around 2014 or 2015, Andrew left MillerCoors and began employment as an environmental consultant for a company called RF Wastewater. (A. Lucas Dep. 13:14–14:5.) During his employment at RF Wastewater, he spent about 90% of his time doing consulting projects for MillerCoors. (A. Lucas Dep. 14:16–21.)

5.     Beginning in or around 2017, Andrew began receiving a salary through a company called One Environmental, which served as his employer until 2023. (Andrew Dep. 21:1–8.)

6.     LH Service, Inc. ("LH Service") is a North Carolina corporation that was incorporated in 2006. (Dep. of Linda Hopper ["L. Hopper Dep."] 9:21–10:13, ECF No. 43.3.) LH Service has been solely owned by Defendant Linda Hopper ("Linda") since its inception. (L. Hopper Dep. 9:18–20.)

7.     In or around 2016, Defendant Harold Hopper ("Harold"), Linda's husband, began serving as LH Service's manager. In 2022, his son, Defendant Tyler Hopper ("Tyler"), began taking over this role. (30(b)(6) Dep. of LH Service, Inc. ["LH Service Dep."] 8:19–9:11, ECF No. 78.3.)

---

[2] The parties to this case include two persons with the last name of Lucas and three persons with the last name of Hopper. For clarity and ease of reference, the Court will refer to each of them throughout this Opinion by their first name.

8.     Harold had been performing maintenance and facilities work for MillerCoors for twenty-five years, and LH Service began doing maintenance services for MillerCoors at the Eden Facility around 2014.  (Dep. of Harold Hopper ["H. Hopper Dep."] 29:21–24, 31:12–21, ECF No. 43.2.)

9.     Around August 2016, MillerCoors announced the closure of its Eden Facility.  (Dep. of Michael J. Lozano ["Lozano Dep."] 9:3–12, ECF No. 78.1.)  As a part of the announcement, Michael J. Lozano became the closing manager of the Eden Facility and was put in charge of executing and reviewing contracts for work regarding the Eden Facility's closure.  (Lozano Dep. 10:21–23, 43:15–17.)  Based on the prior working relationship at MillerCoors between Lozano and Andrew, Lozano requested help from Andrew on certain environmental projects regarding the closure.  (Lozano Dep. 62:7–11.)  Following his discussions with Lozano, Andrew approached Harold about working together on these projects for MillerCoors.  (Aff. of Andrew Lucas ["Lucas Aff."] ¶ 7, ECF No. 77; H. Hopper Dep. 46:12–24.)

10.     The initial project that Andrew and Harold discussed involved the dredging of certain lagoons (the "Lagoon Project").[3]  (H. Hopper Dep. 13:2–25.)

11.     On 29 November 2016, Harold and Andrew met with Thomas Mabe, Andrew's accountant, to discuss the business relationship between Andrew and Harold that would exist regarding their work on the Lagoon Project.  (Dep. of Thomas Mabe ["Mabe Dep."] 8:12–14, 22:21–23:12, ECF No. 78.4; H. Hopper Dep. 253:12–16;

---

[3] The parties refer to this business opportunity as the "Lagoon Project" (and the Court will do so as well in this Opinion) even though it actually consisted of a series of projects, including Basin Number Five cleanup, Basin Number 1 cleanup, and Basin Number 6 cleanup.  (H. Hopper Dep. 135:4–7, 136:1–3, 177:2–7.)

A. Lucas Dep. 174:10–16.) Mabe testified that Andrew and Harold originally discussed setting up a limited liability corporation, but ultimately decided to use LH Service, as the "vehicle" in which to do business at the Eden Facility because it was already an approved vendor of MillerCoors. (Mabe Dep. 23:2–25:24; A. Lucas Dep. 26:1–8.)

12. Mabe's notes from their meeting reflect discussion about Andrew and Harold entering into a joint venture in which the project's revenue and expenses would run through the corporation and any profits would be split between the two of them. (Exhibit F, ECF No. 78.6.)

13. With regard to the Lagoon Project, the record is undisputed that Harold and Andrew agreed to split any profits made on a 50/50 basis. (A. Lucas Dep. 26:1–3; H. Hopper Dep. 81:8–12.)

14. At Harold's suggestion, Andrew and his wife, Plaintiff Shannon Lucas ("Shannon"), formed a company called SDB Partners of Eden, LLC ("SDB") that would receive Andrew's percentage of the profits from the Lagoon Project and then administer those profits to Andrew.[4] (Mabe Dep. 26:14–17; A. Lucas Dep. 31:1–12.) Andrew owned 95% of SDB, while Shannon owned the remaining 5%. (A. Lucas Dep. 54:14–18.)

15. Following the completion of the Lagoon Project, Andrew and Harold each received a 50/50 split of the profits, and the profits from that project are not at issue

---

[4] In addition to serving in this "pass through" role, SDB also apparently performed various services for a different client (Maola Milk) that were unrelated to the projects involving Andrew and Harold. (A. Lucas Dep. 106:15–18, 107:22–25.)

in this lawsuit. Instead, the parties' disagreement concerns the profits for the ensuing projects at the Eden Facility discussed below in which both Harold and Andrew participated.[5]

16. These ensuing projects took place pursuant to a facilities maintenance contract that LH Service entered into with MillerCoors prior to the Eden Facility's closure. (H. Hopper Dep. 29:21–30:4.) Harold described this contract as a "legacy" contract that was subsequently acquired by each of the subsequent owners of the Eden Facility between 2016 and 2023. (H. Hopper Dep. 28:14–21.) In addition, one or more of the projects arose as a result of work orders or subcontracts issued to LH Service by general contractors at the Eden Facility. (LH Service Dep. 11:19–22.)

17. Conceptually, all of the projects that form the basis for the present lawsuit proceeded in the same fashion. As noted above, each of the projects existed pursuant to a contract that LH Service had entered into either with the then-owner of the Eden Facility or with a general contractor working for the then-owner. The work on the project would then be performed by Harold and Andrew (with assistance, as necessary, from workers either employed by LH Service or hired by LH Service as independent contractors). Following the project's completion, payment for all work on the project would be received by LH Service. LH Service would then pay SDB a portion of the profits earmarked for Andrew, and SDB would, in turn, distribute those profits to Andrew.

---

[5] As discussed in more detail throughout this Opinion, Defendants acknowledge that Harold and Andrew agreed to split the profits from the Lagoon Project 50/50 but dispute the notion that Harold likewise agreed to a 50/50 split regarding future projects on which Andrew participated.

18.     The parties disagree, however, on the legal nature of the relationship that existed between them between 2016 and 2023 (following the Lagoon Project) and on whether Harold agreed to carry forward the agreed-upon 50/50 split of profits that had existed for the Lagoon Project to all future projects they worked on.

19.     Andrew's position is that he and Harold had a "handshake agreement" that they would continue to split profits 50/50 on all future projects at the Eden Facility. (A. Lucas Dep. 30:3–8, 161:17–162:6.)  In addition, he contends that a partnership existed that was comprised of two groups—the "Lucas Group" and the "Hopper Group."  According to Andrew, the Lucas Group consisted of himself, Shannon, and SDB, while the Hopper Group consisted of Harold, Linda, Tyler, and LH Service.  He further asserts that the profits for all of the projects were to be split 50/50 between the Hopper Group and the Lucas Group.  (A. Lucas Dep. 30:9–19, 31:13–22.)  Andrew testified that the existence of this agreement is demonstrated by the fact that on multiple occasions he did, in fact, receive payment from LH Service for his work on a project in an amount that represented 50% of the total profits LH Service had earned for that particular project.  (A. Lucas Dep. 162:1–6.)

20.     Harold, conversely, argues that no partnership existed between him and Andrew for the projects that are the subject of this lawsuit and that instead Andrew essentially functioned as an independent contractor for LH Service for which he received compensation.  Although Harold concedes that Andrew was paid some portion of the profits from each of the projects Andrew worked on, Harold testified

that he never agreed in advance that Andrew's share of those profits would always be 50%.

21.    Harold testified that after the Lagoon Project, he did not agree to "partner" on any more projects with Andrew.  Instead, he agreed to (1) allow Andrew to serve as the office manager for LH Service and help out on the remaining closure projects at the Eden Facility (with Andrew's status being that of an independent contractor rather than actually being an employee of LH Service); and (2) pay Andrew compensation for his efforts in the form of some unspecified portion of the overall profits received by LH Service for the work performed on each particular project.  (H. Hopper Dep. 74:13–22, 103:11–104:6.)  Harold testified that he told Andrew up front that the amount Andrew would receive for each project would be whatever amount Harold was able to afford at that specific point in time.  (H. Hopper Dep. 198:1–8, 216:5–10, 249:23–250:1.)  He further testified that in practice Andrew would typically request a certain amount of money in compensation following the completion of a project and that Harold would often pay Andrew the exact amount requested (after checking with Linda to make sure LH Service had enough money in its bank account).  (H. Hopper Dep. 89:8–22, 101:3–12, 135:16–22; LH Service Dep. 16:18–20, 89:22–90:2.)

22.    Despite these discrepancies in Andrew's and Harold's respective testimonies, the parties agree as to other key aspects of their business relationship.  At all times, Harold and Linda retained complete control over LH Service's bank account and over the distribution of funds for these projects.  (A. Lucas Dep. 35:21–

36:4.) Linda signed all the checks on LH Service's behalf regarding these projects—including checks paid to SDB (for the benefit of Andrew). (LH Service Dep. 90:3–5.) Furthermore, Andrew would send all of his proposals regarding these projects to Harold and/or Linda for final approval. (Lucas Aff. ¶¶ 27, 33, 35, 88, 90.)

23. During the entirety of the relationship, Andrew never received any profit distributions directly from LH Service in his individual capacity. Rather, SDB received them as a subcontractor of LH Service. (A. Lucas Dep. 60:6–14, 174:10–16; H. Hopper Dep. 18:10–13; LH Service Dep. 16:23–17:5, 28:25–29:1.) In this regard, SDB was issued 1099s for the work Andrew performed. Neither Andrew nor SDB ever received K-1s. (A. Lucas Dep. 39:7–9, 60:2–5.)[6]

24. Despite Andrew's claim that a partnership existed, he does not dispute that many of the recognized indicia of partnerships under North Carolina law were absent. The partnership that he claims existed was not given a name, and neither Andrew nor any of the other named Plaintiffs made any capital contributions to the alleged partnership. In addition, the alleged partnership did not have a bank account. (A. Lucas Dep. 37:8–9, 52:13–21, 174:5–9.) Moreover, the alleged partnership never filed a tax return. (A. Lucas Dep. 37:18–24.)

25. From 2016–2019, the Eden Facility was owned by MillerCoors. (Lucas Aff. ¶¶ 24–72.) During this time, Andrew performed work in LH Service's office, including writing bid proposals and budget spreadsheets, as well as performing facilities and

---

[6] The record is not entirely clear as to the extent to which Shannon did any work on these projects. In any event, any compensation she may have received for such services would likewise have been paid through SDB. (A. Lucas Dep. 174:17–21.)

lawn maintenance and providing environmental expertise on closure projects. (H. Hopper Dep. 51:5–7, 58:15–20, 63:7–11.)

26. From 2019–2020, the Eden Facility was owned by a company called 770 Ventures. (Lucas Aff. ¶¶ 73–83.) During that time period, Andrew continued to contribute to projects at the Eden Facility. (LH Service's Resp. Pls.' Second Interrogs., Reqs. Produc. Docs., First Req. Admis. ["RFA"] ¶ 25, ECF No. 43.1.)

27. Andrew also worked on projects when the Eden Facility was purchased by Purina in or around 2020. (H. Hopper Dep. 245:10–16; Lucas Aff. ¶ 84–85; RFA ¶ 26.)

28. The record reflects that at various points in time between 2016 and 2023 Andrew referred to his status with LH Service as that of a project coordinator or project manager. On one occasion, he prepared an organizational chart for LH Service that listed him as a "project coordinator." In October 2023, he signed emails identifying his title as "senior project manager" of LH Service. (A. Lucas Dep. 131:22–132:8; Exhibit 66 [10/12/2023 Email], ECF No. 77.66.)[7]

29. Throughout the parties' working relationship, Andrew would periodically prepare and send to the Hoppers spreadsheets outlining the profits stemming from a particular project and listing what he believed were the appropriate distributions of

---

[7] It appears to be undisputed, however, that at no time did Andrew ever actually qualify for legal purposes as an "employee" of LH Service.

those profits.[8] (A. Lucas Dep. 77:10–18; Lucas Aff. ¶ 49; Exhibits 16–21, ECF Nos. 77.16–77.21; Exhibit 33, ECF No. 77.33; Exhibit 35, ECF No. 77.35.)

30. With regard to at least some segment of those projects, Andrew was paid the amounts he requested on those spreadsheets. (H. Hopper Dep. 101:1–16, 122:11–19, 179:19–21.) On multiple occasions, Linda would use the spreadsheets to invoice MillerCoors and then later write checks to SDB based on the amount that Andrew had requested he be paid. (L. Hopper Dep. 103:19–21, 106:21–24, 142:14–18.) As a result, for at least some of these projects, Andrew ultimately received a 50% share of the profits.

31. However, beginning in or around 2021, LH Service began maintaining a reserve of cash for expense payments, resulting in a slowing of profit disbursements. (Lucas Aff. ¶¶ 99–100.) On 9 June 2021, Harold began paying SDB advance profit payments until he and Andrew could "settle up" on final profit splits. (H. Hopper Dep. 318:12–25; Lucas Aff. ¶ 101.) These advanced payments continued throughout 2021–2022 and into 2023. (H. Hopper Dep. 319:9–320:6.)

32. According to Andrew, the agreed-upon plan was to track and account for any "advanced" distributions and then make a full accounting between the parties by the end of 2023. (Lucas Aff. ¶ 115.) As a result, Andrew made, and updated, a spreadsheet titled "Payments to be Received." (Lucas Aff. ¶¶ 113, 116, 118, 120.)

33. In late 2021, Tyler (the son of Harold and Linda) began working full-time for LH Service with the goal of eventually taking over Harold's position with the

---

[8] Andrew testified that at least one of those spreadsheets was actually created by Linda. (A. Lucas Dep. 46:14–24.)

company due to health issues Harold was experiencing. (A. Lucas Dep. 113:11–19, 116:6–9; Dep. of Tyler Hopper ["T. Hopper Dep."] 8:19–22, 26:13–19, ECF No. 78.9.)

34. After Tyler began his employment at LH Service, he started raising questions to Harold about Andrew's role at LH Service and the amount of money that LH Service was paying Andrew. (T. Hopper Dep. 36:9–12, 40:13–41:2, 57:9–12.)

35. In early October 2023, Andrew and Harold met to discuss financial issues. During this meeting, Harold admitted that he owed Andrew money and said he was planning to "settle up" once he had enough funds to do so. (H. Hopper Dep. 337:20–338:3.) At this meeting, Harold agreed to make the rest of the distribution payments he owed Andrew by the end of 2023. (Lucas Aff. ¶ 130.)

36. Following the meeting, on 12 October 2023, Andrew sent Harold an email outlining Andrew's own future plans. (Lucas Aff. ¶ 131; 10/12/2023 Email.) Specifically, Andrew stated that he planned on ending his employment with One Environmental on 31 October 2023 in exchange for becoming an employee at LH Service with a monthly salary of $15,000 and a "formal agreement going forward on our partnership that protects both my family and yours." (10/12/2023 Email.)

37. On 18 October 2023, Harold convened a meeting with Andrew (at which Tyler was also present) during which he informed Andrew that he was terminating his business relationship with Andrew. He then directed Andrew to call the attorney representing the Hoppers to work out an agreement. (H. Hopper Dep. 347:25–348:12; T. Hopper Dep. 86:13–25; Lucas Aff. ¶ 132.)

38. Andrew was subsequently stripped of his access to Quickbooks and his LH Service email account. (T. Hopper Dep. 88:2–11; Lucas Aff. ¶ 137.) The next day, Andrew and Shannon jointly sent an email to Harold and Linda requesting an opportunity to discuss the status of their business relationship and requesting that Harold and Linda "honor our original partnership agreement[.]" (Exhibit 67, ECF No. 77.67.) Harold and Linda did not respond to the email. (Lucas Aff. ¶ 136.)

39. Nine days later, Harold had a meeting with Rose Satterfield, his accountant, during which he told her that he still owed Andrew money. (H. Hopper Dep. 353:5–25.) However, no further payments have been made to Andrew.

40. This lawsuit was initiated on 15 March 2024 in Rockingham County Superior Court by Andrew, Shannon, and SDB as co-Plaintiffs against Harold, Linda, Tyler, and LH Service as co-Defendants. The Complaint contained claims against all Defendants for (1) declaratory judgment; (2) breach of partnership agreement; (3) breach of fiduciary duty; (4) constructive fraud; (5) conversion; (6) dissolution, accounting and appointment of a receiver; (7) breach of joint venture agreement, an alternative claim to the partnership claims; (8) breach of fiduciary duty involving the joint venture, an alternative claim to the partnership claims; (9) fraud, an alternative claim to the partnership claims; and (10) unjust enrichment, an alternative claim to the partnership and joint venture claims. (*See* Compl. ¶¶ 140–262, ECF No. 3.)

41. This case was designated as a complex business case and assigned to the Honorable Julianna Theall Earp on 18 March 2024. (ECF Nos. 1–2.)

42.     On 8 May 2024, Defendants filed an answer and counterclaim for declaratory judgment seeking a declaration that the parties were neither partners nor participatants in a joint venture. (*See* Answer & Countercl., ECF No. 21.)

43.     Defendants' Motion for Judgment on the Pleadings was filed on 3 March 2025 in which they requested dismissal of Plaintiffs' claims for fraud and judicial dissolution. (ECF No. 68.) Defendants filed their Motion for Summary Judgment that same day seeking summary judgment as to all of Plaintiffs' claims. (ECF No. 67.)

44.     On 10 April 2025, Plaintiffs filed the Affidavit of Andrew Lucas (ECF No. 77) in opposition to the Motion for Summary Judgment. On 5 May 2025, Defendants filed the Motion to Strike in which they asserted that the affidavit contained statements impermissibly contradicting Andrew's prior deposition testimony. (ECF No. 85.)

45.     This case was reassigned to the undersigned on 4 June 2025. (ECF No. 90.)

46.     A hearing on the motions was held on 5 August 2025 at which all parties were represented by counsel. (ECF No. 92.)

47.     Following the hearing, the Court requested, and received, supplemental briefing on certain issues from the parties. (ECF Nos. 95, 97.)

48.     The motions are now ripe for resolution.

### LEGAL STANDARD

49.     It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotes omitted).

50. On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.' " *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

51. The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, . . . or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.' " *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P.

56(e) (emphasis omitted)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

## ANALYSIS

52. As an initial matter, counsel for Defendants acknowledged at the 5 August hearing that the arguments contained in their Motion for Judgment on the Pleadings are subsumed within the arguments set out in their Motion for Summary Judgment. (8/5/25 Hearing Transcript 95:22–96:6, ECF No. 96.) Therefore, the Motion for Judgment on the Pleadings is **DENIED as moot**.

53. The Court will first address Defendants' Motion to Strike and then their Motion for Summary Judgment.

## I. Motion to Strike

54. It is well-established that "a party opposing a motion for summary judgment cannot create a genuine issue of material fact by filing an affidavit contradicting his prior sworn testimony." *Cousart v. Charlotte-Mecklenburg Hosp. Auth.*, 209 N.C. App. 299, 304 (2011) (citation omitted). Thus, "where a nonmovant relies solely on his own affidavit that contradicts his prior deposition testimony to create a genuine issue of material fact," the Court will decline to consider the affidavit. *Rider v. Hodges*, 255 N.C. App. 82, 88 (2017). "A motion to strike is addressed to the sound discretion of the trial court." *Clark v. Burnette*, 2021 NCBC LEXIS 45, at *16 (N.C. Super. Ct. Apr. 29, 2021) (citation omitted).

55. Defendants ask the Court to strike Andrew's affidavit on the ground that his statements contained therein conflict with his prior deposition testimony.[9]

56. Based on the Court's careful review of both the affidavit and Andrew's deposition testimony, the Court agrees with Defendants that certain statements in the affidavit improperly conflict with his deposition testimony and should be stricken.

57. First, although paragraphs 10–12 of the affidavit purport to succinctly identify the members of the alleged partnership, his deposition testimony on this identical topic was disjointed and, at times, self-contradictory. (*See, e.g.,* A. Lucas Dep. 25:20–22, 26:9–14, 31:7–12.)

58. Second, despite testifying in his deposition that the alleged partnership did not have a name, (A. Lucas Dep. 37:8–12), paragraph 13 of the affidavit states that "[t]he partnership agreed to do business under the name of LH Service[,]" (Lucas Aff. ¶ 13).

59. Finally, in paragraph 8 of the affidavit Andrew states that he and Harold originally agreed to share not only profits but also losses in connection with their alleged partnership. In his deposition, however, he testified that there was no discussion about sharing losses. (A. Lucas Dep. 54: 7–10.)

60. Accordingly, the Court concludes that the above-referenced contradictory statements contained in his affidavit will be stricken and not considered by the Court in ruling on the Motion for Summary Judgment. Accordingly, the Motion to Strike is **GRANTED** as to these portions of the affidavit. However, to the extent that

---

[9] The Court observes that the affidavit is 144 paragraphs long and extensively discusses the same events about which he testified at length in his deposition.

Defendants are seeking to have additional portions of the affidavit stricken, the Motion to Strike is **DENIED**.

## II. Motion for Summary Judgment

61. As their Complaint makes clear, Plaintiffs' claims can be broken down into three categories. Claims 1–6 (declaratory judgment; breach of the partnership agreement; breach of fiduciary duty; constructive fraud; conversion; and dissolution, accounting, and appointment of a receiver) are premised on Plaintiffs' contention that a partnership existed between them and Defendants. Claims 7–9 (breach of joint venture agreement; breach of fiduciary duty involving the joint venture; and fraud) are alleged in the alternative and premised on the theory that a series of joint ventures (as opposed to a partnership) existed between the parties. Finally, Claim 10 is a standalone claim for unjust enrichment. The Court will therefore analyze each category of claims separately.

### A. Partnership Claims

62. As noted above, Claims 1–6 in the Complaint are premised on the theory that a partnership existed between the parties. (*See* Compl. ¶¶ 149–50, 163–64, 174–75, 178–79, 183, 186–87, 192–99.)

63. Plaintiffs' primary argument in this case is that (1) Harold and Andrew verbally agreed to form a 50/50 partnership in 2016 for the purpose of performing various closure projects at the Eden Facility; (2) Shannon, Linda, Tyler, LH Service, and SDB (or some combination thereof) at various points in time joined as additional partners; (3) over the next seven years, the projects Andrew worked on with Harold

(through LH Service) were in furtherance of the partnership; (4) Andrew received portions of the profits LH Service earned on these various projects; and (5) Defendants have not paid Andrew (or the other Plaintiffs) the full amount of the profits owed.

64. Defendants, conversely, contend that (1) no partnership ever existed; (2) the appropriate legal classification for Andrew's role in connection with these projects was that of an independent contractor for LH Service; and (3) the fact that Andrew's compensation took the form of a share of LH Service's profits for each project did not convert his business relationship with Defendants into a partnership.

65. Under North Carolina law, a partnership is statutorily defined as "an association of two or more persons to carry on as co-owners [of] a business for profit." N.C.G.S. § 59-36(a).

66. "A contract, express or implied, is essential to the formation of a partnership[,]" *Eggleston v. Eggleston*, 228 N.C. 668, 674 (1948) (cleaned up), and "[a] partnership may be formed by an oral agreement." *Campbell v. Miller*, 274 N.C. 143, 149 (1968) (cleaned up). Even without an express agreement, "[a] partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement." *Compton v. Kirby*, 157 N.C. App. 1, 11 (2003). "Courts have considered a variety of circumstances as indicative of a partnership, including, among other things, the filing of a joint tax return, establishment of a partnership bank account, obtaining state licensing as a partnership, and capital contribution[s] by members of

the alleged partnership." *La Familia Cosmovision, Inc. v. Inspiration Networks*, 2014 NCBC LEXIS 52, at *15–16 (N.C. Super. Ct. Oct. 20, 2014) (cleaned up).

67. Although our State's "courts have considered a variety of factors in evaluating whether a partnership exists, 'co-ownership and sharing of any actual profits are indispensable requisites for a partnership.'" *Williams v. Hammer*, 2015 NCBC LEXIS 81, at *10–11 (N.C. Super. Ct. Aug. 12, 2015) (quoting *Best Cartage, Inc. v. Stonewall Packaging, LLC*, 219 N.C. App. 429, 438 (2012) (emphasis omitted)).

68. In *Cutter v. Vojnovic*, 388 N.C. 1 (2025), our Supreme Court very recently addressed the circumstances that must exist in order for an implied partnership to exist. The parties in *Cutter* sought to jointly purchase three independently owned restaurants (referred to collectively as "Jib Jab"). *Id.* at 4. They entered into a nonbinding letter of intent and orally agreed to work together on the purchase, but they never executed a written agreement. *Id.* at 4–5. The parties later submitted another three nonbinding letters of intent to purchase Jib Jab. *Id.* at 5. The final letter of intent purported to require the parties to personally guarantee a loan, which neither of them was willing to do. *Id.* The plaintiff ultimately refused to pay off the defendant's loans to help fund the purchase of Jib Jab and made no further efforts regarding the purchase. *Id.* As a result, the defendant moved forward with the deal on his own. *Id.* at 6.

69. Plaintiff brought suit alleging that he and the defendant had formed a partnership regarding the purchase of Jib Jab. *Id.* Following this Court's ruling in

favor of defendants on their motion for summary judgment as to the partnership claims, the plaintiff appealed. *Id.* at 7.

70.     In affirming this Court's ruling that no partnership existed, the Supreme Court stated as follows:

> [T]he Business Court ultimately reached the correct conclusion: no partnership exists. The Business Court reasoned that undisputed evidence demonstrated that plaintiff and defendant Vojnovic never agreed upon the terms to obtain financing for the Jib Jab purchase. As noted by the Business Court, financing was a critical term of any potential partnership here, because, without it, plaintiff and defendant Vojnovic would not be able to purchase Jib Jab. . . .
>
> Having never agreed on how to finance the purported partnership business, plaintiff and defendant Vojnovic were never even on their way toward co-ownership and sharing profits. . . . A lack of co-ownership is fatal to plaintiff's claim that a partnership existed. *See* N.C.G.S. § 59-36(a).
>
> Furthermore, a review of the undisputed evidence reveals no indicia of a partnership. Plaintiff and defendant Vojnovic never registered a partnership name, made capital contributions to a partnership entity, set up bank accounts for a purported partnership, or filed partnership tax returns. Additionally, Holdings, the entity intended by the parties to be the legal owner of Jib Jab, was established as a limited liability company—not as a general partnership. This distinction indicates a desire to pursue a business relationship with the protections of a limited liability company. Lastly, it is of no legal import whether plaintiff and defendant Vojnovic ever referred to themselves as partners, because a court is "not bound by the labels which have been appended . . . by the parties." *See Branch Banking & Tr. Co. v. Creasy*, 301 N.C. 44, 53 (1980). It is "the substance, not the form, of a transaction [that is] controlling." *Id.*
>
> The undisputed evidence shows that no partnership existed between plaintiff and defendant Vojnovic as related to the Jib Jab opportunity. Thus, the Business Court did not err in granting summary judgment in favor of defendants on plaintiff's claim for judicial dissolution and an accounting of the alleged partnership, plaintiff's direct claim against defendant Vojnovic for breach of the alleged partnership agreement, and

> plaintiff's direct claim against defendant Vojnovic for breach of fiduciary duty.

*Id.* at 18–19.[10]

71.     In a number of other cases based on North Carolina law, the same result has been reached on similar grounds. *See, e.g., McGurk v. Moore*, 234 N.C. 248, 253 (1951) (finding no partnership existed where the element of co-ownership was lacking, the sharing of profits was "merely [ ] repayable 'advances and loans' of money to defendant for use in the business[,]" and all other indicia of a partnership were absent); *Wilder v. Hobson*, 101 N.C. App. 199, 202–03 (1990) (holding that co-ownership requirement for existence of partnership was not satisfied where evidence showed that the parties each personally owned their own vehicles used for taxi service and paid their own taxes and insurance along with the fact that no partnership tax return was filed); *see also In re Brokers, Inc.*, 363 B.R. 458, 470–71 (M.D.N.C. 2007) (finding that the test for partnerships was not met where defendant had complete control over property at issue and there was no evidence of co-ownership of partnership property, filing of partnership tax return, existence of partnership bank accounts, capital contributions made by each member of the alleged partnership, or licensing by the State as a partnership).

72.     Based on its thorough review of the entire record in this case, the Court likewise concludes that no partnership existed here.

---

[10] However, the Supreme Court ruled that this Court had erred in basing its conclusion in part on the fact that there was no indication that the parties had expressly agreed to share losses. The Supreme Court clarified that "a failure to agree on how to share losses does not defeat the formation of a partnership." *Id.* at 16.

73.     With regard to the element of co-ownership, there was no business co-owned by Andrew (or by anyone else he identifies as belonging to the Lucas Group). The only actual business at issue was LH Service, which is a corporation that is solely owned by Linda. Andrew did not own any portion of LH Service; nor did he jointly own any of LH Service's property.

74.     Furthermore, Plaintiffs concede that all of the projects that form the basis for this lawsuit took place pursuant to contracts between LH Service and the then-current owner of the Eden Facility (or a contractor thereof). (Lucas Aff. ¶ 13.) Thus, all of the work at issue performed by Andrew was for tasks that LH Service was contractually obligated to perform.

75.     Moreover, Plaintiffs concede that Andrew lacked the authority to enter into contracts or sign checks with regard to any of these projects.

76.     Indeed, Andrew's own deposition testimony demonstrates the absence of key indicia of a partnership as recognized by North Carolina courts. He testified that (1) he did not make any capital contributions to the alleged partnership (A. Lucas Dep. 52:13–21); (2) no partnership bank account existed (A. Lucas Dep. 174:5–9); (3) no tax returns were filed by the alleged partnership (A. Lucas Dep. 37:18–24); and (4) there was no partnership name (A. Lucas Dep. 37:8–12). Nor is there any evidence that Andrew or Harold ever registered a partnership with the State.

77.     In addition, it is undisputed that the payments to SDB were made through 1099s rather than K-1s. (A. Lucas Dep. 39:7–9, 60:2–5.)[11]

---

[11] A Schedule K-1 "sets out each partner's allocated share of tax items," *McCabe v. N.C. Dep't of Revenue*, 2023 NCBC LEXIS 53, at *4, n.2 (N.C. Super. Ct. Apr. 3, 2023), while a Form

78.     Although Plaintiffs repeatedly point to the fact that Andrew received (through SDB) a portion of the profits LH Service earned from the projects he worked on, this fact—without more—is insufficient to establish a partnership. N.C.G.S. § 59-37 provides in relevant part that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that he is a partner in the business, but no such inference shall be drawn if such profits were received in payment . . . [a]s wages of an employee[.]" N.C.G.S. § 59-37(4)(b); *see also Wilkinson v. Coppersmith*, 218 N.C. 173, 174 (1940) ("While an agreement to share profits as such is one of the tests of partnership, an agreement to receive part of the profits for services rendered, as a means only of ascertaining the compensation, does not create a partnership."); *Am. Trust Co. v. Life Ins. Co.*, 173 N.C. 558, 562 (1917) (finding "no partnership if sharing in the profits is a mere means of ascertaining and determining the compensation for the services rendered") (citation omitted).

79.     Thus, although the manner in which Andrew received payment for his services was somewhat unique (i.e., in the sense that he would request of Harold a certain percentage of the profits received by LH Service for a particular project and would often—although not always—receive the sum he had requested), that is simply not enough to overcome the above-referenced fatal defects in Plaintiffs' argument that a partnership existed.

---

1099 is issued to "contractors from whom tax was withheld." 17 N.C.A.C. 6C.0203(a). This distinction is significant as all partnerships are required to file with the IRS a "Schedule K-1 for each partner . . . with the [U.S. Return of Partnership Income] to report the partners' shares of any income, losses, deductions, credits, and other relevant information." *Blair v. Blair*, 260 N.C. App. 474, 502 (2018).

80. Finally, to the extent Plaintiffs attach significance to isolated references reflected in the record to Andrew and Harold being "partners," our Supreme Court has rejected the argument that such references are relevant to the analysis. *See Cutter*, 388 N.C. at 18 ("[I]t is of no legal import whether plaintiff and defendant Vojnovic ever referred to themselves as partners, because a court is not bound by the labels which have been appended by the parties) (cleaned up).[12]

81. For all of these reasons, Defendants' Motion for Summary Judgment is **GRANTED** in favor of Defendants on Claims 1–6 of the Complaint.

82. For the same reasons, summary judgment is also **GRANTED** in favor of Defendants on their counterclaim seeking a declaration that no partnership existed.

**B. Joint Venture Claims**

83. As noted above, Claims 7–9 of the Complaint are premised on the alternative theory that a series of joint ventures existed between the parties. (*See* Compl. ¶¶ 205–06, 232–34, 242–44.)

84. With regard to these three claims, Plaintiffs assert that each project Andrew worked on constituted a joint venture between him (and potentially some or all of the other named Plaintiffs) and Harold (and potentially some or all of the other named Defendants).

85. Our Supreme Court has explained the characteristics of a joint venture as follows:

---

[12] Moreover, the Court observes that at various times Andrew referred to himself not as a partner but rather as a "project coordinator" for LH Service and as a "senior project manager" of that company. (A. Lucas Dep. 131:22–132:8; 10/12/2023 Email.)

A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term.

. . .

Facts showing the joining of funds, property, or labor, in a common purpose to attain a result for the benefit of the parties in which each has a right in some measure to direct the conduct of the other through a necessary fiduciary relation, will justify a finding that a joint adventure exists.

. . .

To constitute a joint adventure, the parties must combine their property, money, efforts, skill, or knowledge in some common undertaking. The contributions of the respective parties need not be equal or of the same character, but there must be some contribution by each coadventurer of something promotive of the enterprise.

*Pike v. Wachovia Bank & Trust Co.*, 274 N.C. 1, 8–9 (1968) (cleaned up).

86.     "In North Carolina, joint ventures are similar to partnerships, and they are 'governed by substantially the same rules.' " *Azalea Garden Bd. & Care, Inc. v. Vanhoy*, 2009 NCBC LEXIS 10, at *10 (N.C. Super. Ct. Mar. 17, 2009) (cleaned up); *see Jones v. Shoji*, 336 N.C. 581, 585 (1994) (stating that the Court of Appeals correctly looked to the Uniform Partnership Act when analyzing a joint venture claim); *Morris Int'l, Inc. v. Packer*, 2021 NCBC LEXIS 16, at *17 (N.C. Super. Ct. Feb. 22, 2021) ("A joint venture is governed by partnership law, as codified in the Uniform Partnership Act.").

87.     The main distinction between a partnership and a joint venture is the latter is "narrower in scope and purpose." *Jones v. Shoji*, 110 N.C. App. 48, 51 (1993).

88.     With regard to the "right . . . to direct the conduct of the other" prong of the test, a court must look to see whether "each joint venturer stand[s] in the relation of principal, as well as agent, as to each of the other coventurers." *Cheape v. Chapel Hill*, 320 N.C. 549, 562 (1987) (cleaned up).  Even where there is sufficient evidence to show one party served as an agent to the other, if there is nothing showing a reciprocal agent relationship, then no joint venture can be established.  *See id.* ("Accordingly, while the agreement might establish Fraser as an agent of the Town for the limited purpose of authorizing minor change orders, there is nothing in the agreement that establishes the Town as an agent of Fraser.") (emphasis omitted).

89.     In *Southeastern Shelter Corp. v. Btu, Inc.*, 154 N.C. App. 321 (2002), our Court of Appeals determined that no joint venture had been shown to exist where such mutual agency was absent.

> Under the parties' agreement, Chesson was responsible for teaching all aspects of the fireproofing business to defendants. Chesson shared his knowledge and experience with defendants and assisted them in making bids on fireproofing projects. With twenty years of experience in the fireproofing business, Chesson's input on bids and other operational decisions carried great weight in the final decision. However, Chesson testified that he could only recommend a bid to defendants. The ultimate decision whether to accept a job, and at what price, was left to defendants. Accordingly, there is nothing in the agreement that establishes Chesson and SES as agents of the individual defendants and BTU. Likewise, there is nothing that establishes defendants as agents of plaintiffs. Thus, the agreement fails to place the parties in the relation of principal, as well as agent, as to each other.

*Id.* at 328.

90.     The record evidence here fails to show that Andrew (or any of the other Plaintiffs) had the authority to direct or control the acts of Harold (or any of the other

Defendants). To the contrary, as noted earlier, the undisputed evidence shows that Andrew lacked the authority to sign contracts or make payments on behalf of LH Service. Andrew sent draft proposals to Harold and Linda for approval, and all contracts were entered into between LH Service and the owner of the Eden Facility (or with the owner's general contractor). Further, Andrew had no control over LH Service's finances and could not sign any checks on LH Service's behalf. All sums Andrew received had to be approved by Harold and were then paid via checks signed by Linda.

91. In sum, the record fails to show how Plaintiffs—whether collectively or individually—exercised any control over Defendants' actions.

92. For all these reasons, summary judgment is **GRANTED** in favor of Defendants on Claims 7–9 of the Complaint.

93. For these same reasons, summary judgment is also **GRANTED** in favor of Defendants on their counterclaim seeking a declaration that no joint venture existed.

**C. Unjust Enrichment**

94. Plaintiffs' only remaining cause of action is its standalone claim for unjust enrichment. (*See* Compl. ¶¶ 253–62.)

95. This Court has previously stated the following regarding unjust enrichment:

> "In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party." *Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 4, at *16 (N.C. Super. Ct. Jan. 12, 2017) (citing *Se. Shelter Corp.*

*v. BTU, Inc.*, 154 N.C. App. 321, 330 (2002)). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atl. Coast Line R.R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96 (1966). However, "[i]f there is a contract between the parties[,] the contract governs the claim and the law will not imply a contract." *Booe v. Shadrick*, 322 N.C. 567, 570 (1988).

*Higgins v. Synergy Coverage Sols., LLC*, 2020 NCBC LEXIS 6, at *23 (N.C. Super. Ct. Jan. 15, 2020).

96. This Court has previously held that an alternative claim for unjust enrichment can remain viable even where a separate claim premised on the existence of a partnership has been dismissed. For example, in *Bohn v. Black*, 2019 NCBC LEXIS 35 (N.C. Super. Ct. June 3, 2019), this Court determined there was insufficient evidence of a partnership between the parties, stating the following:

> In short, the undisputed evidence shows that Judith controlled the money coming into and going out of the campground business and made all major decisions related to the campground. Laurie and her sisters had no "authority of any kind over each other" or over the campground business and its property. . .
>
> Taking the evidence in the light most favorable to Laurie, the Court concludes that the essential element of co-ownership is lacking. Thus, the Court grants Defendants' motion for summary judgment as to the claim for de facto partnership and denies the Bohns' motion.

*Id.* at *17–18.

97. However, this Court then proceeded to deny summary judgment on the *Bohn* plaintiffs' alternative unjust enrichment claim.

> Some evidence suggests that Judith induced Laurie and Matt to contribute their time and money to the campground based on the promise that they would receive a home and that Laurie would co-own the campground business. . . . Whether Judith actually made those

promises is disputed, but the Court must accept them as true at this stage, and Laurie and Matt assert that they contributed their labor and money in reliance on them. . . . Laurie and Matt have also pointed to evidence that they built their modular home, at least in part, using their own money. . . . If the jury credits the Bohns' view of the facts, it could conclude that Judith induced them to improve her land and business based on promises she failed to keep. The jury could also conclude that Judith would be unjustly enriched if allowed to keep the benefit of those improvements.

. . .

The Court denies Defendants' motion for summary judgment on the claim for unjust enrichment.

*Id.* at *27–29.

98. Taken in the light most favorable to Plaintiffs, the evidence in the present case shows that (1) Andrew worked on a number of projects between 2016 and 2023 for LH Service in which he was paid a portion of the profits; (2) although at times he received the sums he requested for his work on a particular project, beginning in or around 2021 he did not receive all of the amounts he was owed; (3) Harold assured Andrew that they would "settle up" at a later date; (4) during a meeting with Lucas in October 2023, Harold confirmed his intentions to "settle up" with Andrew by the end of 2023; and (5) Andrew has never received any money from Defendants since those representations were made.

99. Moreover, Harold admitted in his deposition that he still owes money to Andrew. (H. Hopper Dep. 353:5–9.)

100. In their briefs, Defendants fail to specifically dispute this evidence. Instead, the only argument they make is based on timeliness. Defendants contend that this claim was not filed within the applicable limitations period—that is, within

three years of the date when Plaintiffs first became aware that they had not received the sums they believed they were owed for the projects at issue.

101.    However, the Court concludes that Defendants are not entitled to summary judgment on statute of limitations grounds.  On the present record, it is not clear exactly when the unjust enrichment claim would have initially accrued.  Moreover, as noted above, there is evidence that Harold promised in 2023 to "settle up" with Andrew (which never actually happened), and this suit was instituted the following year in 2024.

102.    Although the Court therefore concludes that the unjust enrichment claim raises a triable issue, it is presently unclear who the parties to such a claim should be.  Although the Complaint purports to assert this claim on behalf of all named Plaintiffs (Andrew, Shannon, and SDB) and against all named Defendants (Harold, Linda, Tyler, and LH Service), neither side has briefed the issue of which of these individuals/entities should be parties to the unjust enrichment claim based on the evidence in the record.

103.    The Court, in its discretion, determines that it would benefit from supplemental briefing on this issue (as set out in more detail below).[13]  The parties shall **not** accompany their supplemental briefs with any new affidavits or other new evidence and shall instead rely solely on evidence **currently existing in the record** (with appropriate citations thereto).

---

[13] Alternatively, the parties are free to file a stipulation with the Court (within the same deadline set out below) containing their joint position on who the proper parties are to the unjust enrichment claim.

## CERTIFICATION

104. On 14 January 2026, the Court filed its Order and Opinion on Defendants' Motion for Summary Judgment, Defendants' Motion for Judgment on the Pleadings, and Defendants' Motion to Strike the Affidavit of Andrew Lucas (the "14 January Opinion," ECF No. 98), which (for the same reasons set forth above) dismissed all partnership and joint venture claims against Defendants, concluded that the unjust enrichment claim raised a triable issue of fact, and deferred ruling on the proper parties to Plaintiffs' unjust enrichment claim pending the receipt of supplemental briefing from the parties. *See Lucas v. Hopper*, 2026 NCBC LEXIS 4 (N.C. Super. Ct. Jan. 14, 2026). At the time the 14 January Opinion was filed, the Court did not certify its rulings dismissing Plaintiffs' partnership and joint venture claims against Defendants as a final judgment under Rule 54(b).

105. On 13 March 2026, Plaintiffs filed a Motion for Reconsideration of Orders Entered at ECF No. 98 and ECF No. 103, (ECF No. 108), which the Court subsequently denied. (ECF No. 114.)

106. On 16 March 2026, Plaintiffs filed a Motion for Entry of Final Judgment under Rule 54(b) as to One or More but Fewer Than All of the Claims or Parties (the "Motion for Final Judgment," ECF No. 110), seeking the Court's certification for immediate appeal of the 14 January Opinion as a final judgment and the entry of a stay as to any remaining proceedings before the Court while such an appeal is pending. Plaintiffs contend that proceeding to trial on the unjust enrichment claim, "would be a waste of judicial resources" and "poses a risk of inconsistent verdicts."

(Mem. Supp. Pls.' Mot. Entry Final J. Under Rule 54(b) 3, ECF No. 111.) Defendants do not oppose Plaintiffs' request for certification, provided that the Court orders a stay of trial proceedings on the remaining unjust enrichment claim during the pendency of the appeal. (Defs.' Statement Regarding Pls.' Mot. Certify Immediate Appeal, ECF No. 112.)

107. The Court, in the exercise of its discretion under BCR 7.4, elects to enter this Order and Opinion without a hearing.

108. Where, as here, a court order does not "dispose of the entirety of the case," the order is interlocutory and not usually subject to immediate appeal. *See, e.g.*, *Chidnese v. Chidnese*, 210 N.C. App. 299, 302–03 (2011); N.C. R. Civ. P. 54. An interlocutory order may be immediately appealable, however, if the trial court certifies the order as a final judgment under Rule 54(b). *See Doe v. City of Charlotte*, 273 N.C. App. 10, 19–20 (2020).

109. Rule 54(b) states in relevant part:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, crossclaim, or third-party claim, or when multiple parties are involved, the court may enter a final judgment as to one or more but fewer than all of the claims or parties only if there is no just reason for delay and it is so determined in the judgment. Such judgment shall then be subject to review by appeal or as otherwise provided by these rules or other statutes.

N.C. R. Civ. P. 54(b).

110. Rule 54(b) further provides that "any order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." *Id.* Rule 54(b) thus permits a trial

court to certify an interlocutory order as a final judgment subject to immediate appeal by amending the court's previous order when the trial court concludes that there is no just reason to delay the appeal of the court's rulings. *See Doe*, 273 N.C. App. at 20 (noting that to permit an immediate appeal, "the trial court simply could amend the initial order by entering a new order with the same substantive language as the initial order but with the additional Rule 54(b) certification language added" (cleaned up)).

111.    Our appellate courts have affirmed a trial court's finding of no just reason for delay of an appeal in various fact-specific circumstances, including where "the claims that were dismissed and those that remain are factually and legally intertwined and pertain to essentially the same conduct such that proceeding to trial could produce verdicts inconsistent with verdicts which may later result from trial of one or more of the claims which were dismissed." *Kinesis Adver., Inc. v. Hill*, 187 N.C. App. 1, 8 (2007) (cleaned up).

112.    No just reason for delay has also been found where immediate appeal would "promote judicial economy" when numerous claims are involved. *See Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 538 (2007). Certification is left to the discretion of the trial court and the court's decision is given "great deference." *See, e.g., Hoke Cnty. Bd. of Educ. v. State*, 198 N.C. App. 274, 277 (2009) ("We generally accord great deference to a trial court's certification that there is no just reason to delay the appeal."); *see generally* G. Gray Wilson, *North Carolina Civil Procedure*, Ch. 54, § 54-3.

113.   After considering the Motion for Final Judgment, the related briefs, the record in this case, and the applicable law, the Court concludes that it should amend the 14 January Opinion to include a certification of its dismissal of Plaintiffs' partnership and joint venture claims as a final judgment subject to immediate appellate review.

114.   The remaining unjust enrichment claim and the dismissed claims are legally intertwined and arise from the same facts and circumstances surrounding the parties' working relationship at the Eden Facility. *See Kinesis Adver., Inc.*, 187 N.C. App. at 9 (finding the claims were "factually and legally intertwined" where they were based on the same alleged conduct).   In particular, Plaintiffs' claim for unjust enrichment against Defendants was pled in the alternative to the partnership and joint venture claims, and stems from a series of projects that Plaintiff Andrew Lucas worked on with Defendants at the Eden Facility.   Thus, proceeding to trial on Plaintiffs' remaining unjust enrichment claim before resolution of an appeal of the dismissal of the partnership and joint venture claims would potentially result in two trials involving identical facts, albeit on different legal theories, with the risk of different juries reaching inconsistent verdicts on the same disputed facts.

115.   As such, the Court concludes that Plaintiffs have a substantial right to have these same disputed facts determined by the same jury and that, as a result, there is no just reason to delay an appeal of the dismissal of the partnership and joint venture claims. *See, e.g.*, *Shearon Farms Townhome Owners Ass'n II v. Shearon Farms Dev., LLC*, 272 N.C. App. 643, 647 (2020) ("[W]hen the same fact is determinative of the

same issue in multiple claims, there is a substantial right to have those factual issues determined by the same jury to avoid the risk that two juries decide that fact differently, leading to two judgments from the same initial lawsuit with incompatible outcomes."). Based on the above, the Court further concludes that it would be inefficient and potentially wasteful for the parties and the Court to proceed to trial at this time on Plaintiffs' remaining unjust enrichment claim prior to the resolution of an appeal of the dismissal of the partnership and joint venture claims.

116. For each of these reasons, therefore, the Court concludes that there is no just reason to delay an appeal of the Court's dismissal of Plaintiffs' partnership and joint venture claims and that the Court should therefore certify its rulings dismissing those claims herein as a final judgment as to those matters under Rule 54(b).

## CONCLUSION

**THEREFORE, IT IS ORDERED** as follows:

1. Defendants' Motion to Strike is **GRANTED in part** and **DENIED in part**.

2. Defendants' Motion for Judgment on the Pleadings is **DENIED as moot**.

3. Defendants' Motion for Summary Judgment is **GRANTED** in favor of Defendants on Claims 1–9 in the Complaint.

4. Summary Judgment is **GRANTED** in favor of Defendants on their counterclaim for declaratory judgment.

5. The Court **DEFERS** ruling on Defendants' Motion for Summary Judgment with regard to Plaintiffs' unjust enrichment claim (Claim 10).

6. For the reasons set forth above, the Court, in the exercise of its discretion, hereby **CERTIFIES** its rulings herein granting Defendants' Motion for Summary Judgment on Claims 1–9 as a final judgment as to those matters under Rule 54(b).

   **SO ORDERED**, this the 23rd day of April, 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases